IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ASSOCIATED BUILDERS AND )
CONTRACTORS, INC., DELAWARE )
CHAPTER, )
 )
      Plaintiff, )
 )
v. ) Civ. No. 15-682-SLR
 )
NEW CASTLE COUNTY, )
 )
      Defendant, )
 )
and )
 )
DELAWARE BUILDING AND )
CONSTRUCTION TRADES COUNCIL, )
 )
      Intervener/Defendant. )

---

Victoria K. Petrone, Esquire of Logan & Petrone, LLC, New Castle, Delaware. Counsel for Plaintiff.

Bernard Pepukayi, Esquire and Wilson Buckmaster Davis, Esquire of New Castle County Law Department, New Castle, Delaware. Counsel for Defendant New Castle County.

Michele D. Allen, Esquire of Law Offices of Michele D. Allen, LLC of Hockessin, Delaware. Of Counsel: Raymond G. Heineman, Esquire of Kroll Heineman Carton, LLC, Iselin, New Jersey. Counsel for Intervenor/Defendant Delaware Building and Construction Trades Council.

---

**MEMORANDUM OPINION**


Dated: November 17, 2015
Wilmington, Delaware

*signature*
ROBINSON, District Judge

## I. INTRODUCTION

In August 2015, plaintiff Associated Builders and Contractors, Inc., Delaware Chapter ("ABC"), filed its complaint in the above captioned matter and requested that defendant New Castle County ("NCC") be enjoined from enforcing the apprenticeship requirements of County Code § 2.05.303.D.3.a (sometimes referred to as "the Code") to its "Route 9 Library Project." (D.I. 1, 14) Thereafter, the Delaware Building and Construction Trades Council ("Trades Council") moved to intervene; in lieu of answers, both NCC and the Trades Council filed motions to dismiss.

Pursuant to the Code, when the probable cost of a NCC construction contract is expected to exceed one hundred thousand dollars ($100,000.00), construction contractors seeking to perform work ("bidders") on such publicly funded projects must meet certain requirements, including:

> viii. Certification that, for each trade or classification in which the bidder will employ craft workers for the . . . contract, the bidder:
>
> (a) participates in a Class A Apprenticeship Program; or
>
> (b) participates in an apprenticeship program that has been approved by the U.S. Department of Labor or a State apprenticeship agency within the past three (3) years; or
>
> (c) commits that, at the time bidder executes the . . . contract, it will be participating in an apprenticeship program that has been approved by the U.S. Department of Labor or a state apprenticeship agency.

County Code § 2.05.303.D.3.a ("the Code"). A "Class A Apprenticeship Program" is defined as "an apprenticeship program which is currently approved by the U.S. Department of Labor, or a state apprenticeship agency, that has graduated apprentices to journeyperson status for three (3) of the past five (5) consecutive years." County

Code § 2.05.303.A. As a condition to submitting a bid for consideration by the County, bidders must submit a Responsibility Certification certifying to their participation in an apprenticeship program. County Code § 2.05.303.D.3.a.

Pursuant to the applicable "apprenticeship and training regulations," 19 Del. C. § 1101, in order to be approved by the Delaware Department of Labor, an apprenticeship program must have active enrolled apprentices within 12 months of program registration; such a program will be cancelled if there are no active apprentices within a 180-day period. *Id.* at 4.8-4.9. The "standards of apprenticeship" are exacting, requiring sponsored apprenticeship programs to include, *inter alia*, minimum classroom hours per year, an "organized written plan," apprenticeship terms, wage rates, record-keeping, and apprentice-journeyperson ratios. *Id.* at 6.0. To compound the difficulty for companies such as ABC, "[o]ut of 26 work classifications, the Delaware Department of Labor has only approved apprenticeship programs in 14. Because there are no currently available apprenticeship programs in the remaining classifications in which bidders can participate, ABC members and other companies in those 12 trades cannot satisfy [NCC's] apprenticeship mandate and cannot bid on [NCC] projects." (D.I. 19 at 4)

ABC has moved to enjoin the enforcement of the above identified apprenticeship requirements and associated regulations, arguing that they are preempted by ERISA.[1] Defendants oppose the requested relief and have responded with motions to dismiss.

---

[1] Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.

Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391.

## II. INJUNCTIVE RELIEF

### A. Standard of Review

As explained by the United States Court of Appeals for the Third Circuit,

> [p]reliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." . . . "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." . . . The "failure to establish any element . . . renders a preliminary injunction inappropriate." . . . The movant bears the burden of showing that these four factors weigh in favor of granting the injunction.

*Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citations omitted). "'[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties.'" *Kos Pharmaceuticals, Inc. v. Andrx Corp*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

### B. Likelihood of Success

Because ERISA "was enacted to provide uniform federal regulation of employee benefit plans, . . . ERISA preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .'" *Ferguson Elec. Co., Inc. v. Foley*, 115 F.3d 237, 240 (3d Cir. 1997) (citing 29 U.S.C. § 1144(a)). A "law 'relate[s] to' a

3

covered employee benefit plan . . . 'if it [1] has a connection with or [2] reference to such a plan.'" *Id.* (citing *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 117 S. Ct. 832, 837 (1997)). According to the Third Circuit in *Ferguson,* "[a]pprenticeship laws make 'reference to' ERISA plans where 'approved apprenticeship programs need . . . necessarily be ERISA plans.'" *Ferguson*, 115 F.3d at 241 (citing *Dillingham*, 117 S. Ct. at 838). In other words, "[w]here apprenticeship laws are 'indifferent to the funding, and attendant ERISA coverage, of apprenticeship programs,' they do not make 'reference to' ERISA plans." *Ferguson*, 115 F.3d at 241 (citing *Dillingham*, 117 S. Ct. at 839).

Plaintiff does not contend that the Code "references" an ERISA plan. The parties do dispute whether the law at issue "has a connection with" ERISA plans. In this regard, the Third Circuit has explained that "[a] law has a 'connection with' ERISA plans if it dictates the choices faced by ERISA plans. It is not enough if the law merely provides economic incentives to ERISA plans but does not 'bind [them] to anything.'" 115 F.3d at 240 (citing *Dillingham*, 117 S. Ct. at 841).

ABC directs the court to *Merit Construction Alliance v. City of Quincy*, 759 F.3d 122 (1st Cir. 2014) ("*Quincy*"), as the most analogous case to the facts at bar. The defendant City of Quincy appealed from the district court's ruling that ERISA preempted the municipal ordinance mandating the establishment of a specific type of apprentice training program, that is, a program that required "bidders on municipal public works projects [to] 'engage[ ] in a bona fide apprentice training program' registered with the Massachusetts Department of Labor Standards" with "at least one apprentice hav[ing]

4

graduated from the program in the twelve months immediately preceding the bid." *Id.* at 125. The district court concluded that the ordinance's requirement that "every bidder . . . have an apprenticeship program meeting Massachusetts standards" supplied the "connection with" component of the "two-sided ERISA preemption calculus." *Id.* at 128.

The First Circuit started its analysis with the observation that "programs 'established or . . . maintained for the purpose of providing . . . apprenticeship or other training' qualify as ERISA employee welfare benefit plans. 29 U.S.C. § 1002 (1). Thus, ERISA will preempt the Ordinance's operation if and to the extent that the Ordinance bears a sufficient connection to such programs." *Id.* The Court recognized that "state laws that merely exert an 'indirect economic influence' on a plan do 'not bind plan administrators to any particular choice' and, thus, do not come within ERISA's preemptive reach." *Id.* (citation omitted). After explaining that "[t]he path from influence to coercion amounts to a continuum and it is not always a simple task to determine where along this continuum a particular state law falls," *id.* at 129, the Court concluded that the case before it did not "greatly tax [its] capacity for discernment." *Id.*

> [T]he Ordinance categorically requires all contractors on Quincy public works projects to operate a Massachusetts-approved apprentice training program. . . . Incorporating the state's standards imposes a raft of stringent conditions on would-be bidders including, among others, documenting of the program's terms and conditions. . ., the location of the program's apprentice activities . . ., training and instruction. . ., wage rates. . ., recordkeeping. . ., instructor qualifications. . ., apprentice enrollment. . ., reporting. . ., and termination. . . .
>
> With such a compendium of stipulations in place, we have no difficulty concluding that the Ordinance goes far beyond simply influencing ERISA apprentice training programs. It mandates an employee benefit structure and specifies how that structure must be administered. This is simply too intrusive to withstand ERISA preemption.

5

*Id.* The Court summarized its conclusions as follows:

> ERISA specifically includes apprentice training programs in its definition of employee welfare benefit plans. A state-law mandate regarding the structure or administration of such plans falls within the ambit of ERISA's preemption provision. The Ordinance comprises such a mandate because it dictates the establishment of an employee benefit structure and sets the standards governing that structure. Even though a non-ERISA option might be available for compliance with the Ordinance, the availability of such an option does not save the Ordinance: its mandate still has the effect of destroying the benefit of uniform administration that is among ERISA's principal goals.

*Id.* at 131.

Defendants counter with two different theories as to why the Code is not preempted by ERISA, even if it could be characterized as using mandatory language (as opposed to merely providing economic incentives to comply with the law). The first theory is explained by the Sixth Circuit in *Associated Builders & Contractors v. Michigan Dept. of Labor & Economic Growth*, 543 F.3d 275 (6th Cir. 2008) ("*Michigan DOL*"), a case involving Michigan laws that imposed two requirements on the training and supervision of apprentice electricians.[2] The Court first noted that the laws did not "refer" to an ERISA plan because they affected ERISA and non-ERISA plans alike. (*Id.* at 281) With respect to the "connection with" prong of the preemption test, the Court held that this inquiry "requires two showings to preempt a state law: (1) the law at issue must mandate (or effectively mandate) something; and (2) that mandate must fall within the area that Congress intended ERISA to control exclusively." *Id.*

---

[2]The laws required there to be a one-to-one ratio between trained electricians and apprentice electricians at all work sites, and also established an "equivalency requirement," which meant that individuals could be certified in an apprenticeship program only if the program met the apprentice-training requirements imposed by the U.S. Department of Labor. 543 F.3d at 277.

6

The Court reasoned that, although the ratio and equivalency rules plainly contained mandates, such mandates did not fall within the scope of issues that ERISA prohibits the States from regulating. *Id.* at 282. The Court explained as follows: (1) because "no one disputes that the States have long regulated apprenticeship standards and training or that this topic of regulation falls well within their traditional police powers," there is a "presumption that Michigan's requirements fall outside of ERISA's preemptive reach" (*id.*); (2) "ERISA 'has nothing to say' about 'the standards to be applied to apprenticeship training programs,' and neither 'ERISA [nor] its legislative history [evinces] any intent on the part of Congress to preempt state apprenticeship training standards'" (*id.*, citation omitted); (3) "what triggers ERISA's potential application to these laws is not the existence of an apprenticeship training program, . . . but the existence of a separate fund to support the training program" (*id.*); (4) ERISA does not regulate, e.g., the safety of apprentices or other substantive apprenticeship training standards but, rather, ERISA is "'expressly concerned'" with, e.g., "'reporting, disclosure, fiduciary responsibility, and the like'" (*id.* at 283); (5) "were it otherwise, ERISA might preempt all sorts of laws of general applicability that affect ERISA plans, a view that would preempt a slew of state laws" (*id.*); and (6) other courts have found such apprenticeship requirements to be "'outside the area of ERISA's concerns'" (*id.* at 284). The Court concluded that the Michigan laws at issue, which prevented "electrical contractors from providing some forms of apprenticeship training address matters that 'are quite remote from the areas with which ERISA is expressly concerned'" and, therefore, such laws were not preempted by ERISA. *Id.* at 285.

The second theory presented by defendants is the market participation theory, as described[3] by the United States Supreme Court in *Building and Construction Trades Council v. Associated Builders & Contractors*, 507 U.S. 218 (1993) (referred to hereafter as "*Boston Harbor*"), as follows:

> There is no reason to expect . . . features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity **as purchaser** should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction.

*Id.* at 231-32.

The Third Circuit, in *Hotel Employees & Restaurant Employees Union v. Sage Hospitality Resources, LLC*, 390 F.3d 206 (3d Cir. 2004) ("*Sage*"), expanded on the above principle and articulated a two-step test for determining whether a government's condition of funding constitutes market participation that falls within the *Boston Harbor* exception to preemption review:

> First, does the challenged funding condition service to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier? Second, is the scope of the funding condition "specifically tailored" to the proprietary interest? . . . If a condition of procurement satisfies these two steps, then it reflects the government's action as a market participant and escapes preemption review. But if the funding condition does not serve, or sweeps more broadly than a government

---

[3]Albeit in the context of project labor agreements, not apprenticeship programs, in the construction industry.

8

agency's proprietary economic interest, it must submit to review under [in this case] labor law preemption standards.

*Id.* at 216 (citation omitted).

I acknowledge that the First Circuit's analysis in *Quincy* is on all fours with the facts of record, as far as it goes. The Court in *Quincy,* however, did not address either the market participation theory (because the defendant in *Quincy* failed to raise it below, see 759 F.3d at 131) or the second prong of the *Michigan DOL* preemption test, that is, whether the mandatory language at issue fell "within the area that Congress intended ERISA to control exclusively," 543 F.3d at 281. With respect to the former, under *Sage's* two-step test, there can be no dispute that the Route 9 Library Project is funded by NCC; therefore, NCC has a proprietary interest in the project. As to the "specifically tailored" requirement, I agree with the reasoning in *Lott Contractors, Inc. v. Camden Cty. Bd. of Chosen Freeholders,* 1994 WL 263851, at *11-12 (D. N.J. Jan. 31, 1994), that the crucial factor is whether the Code requirements apply to every construction project in NCC or only to NCC's own projects. The Code applies only to NCC's own projects and, therefore, is sufficiently tailored to NCC's proprietary interest.

I also agree with the reasoning of the Sixth Circuit in *Michigan DOL*, to wit, even if a disputed State or local law mandates various apprenticeship conditions for bidding, preemption is not appropriate unless those mandates fall within the area that Congress intended ERISA to control exclusively. In this regard, there is no indication of record that contradicts the logic applied in *Michigan DOL*, that is: (1) States have long regulated apprenticeship standards and training; (2) ERISA has nothing to say about the standards to be applied to apprenticeship training programs; and (3) what triggers

9

ERISA's potential application to such laws is not the existence of an apprenticeship training program, but the existence of a separate fund to support the training program and the related reporting, disclosure, and fiduciary responsibilities associated therewith. See 543 F.3d at 282. Given that the Code applies to ERISA and non-ERISA plans alike, and has no directive related to the funding sources of any apprenticeship program, I conclude that plaintiff has not met its burden to demonstrate its likelihood of success on the preemption issue.[4]

## C. Irreparable Harm

Plaintiff argues that, in the absence of injunctive relief, its members will be irreparably harmed because they "could lose work as well as the opportunity to meaningfully compete for contracts," and this type of injury cannot be compensated by money damages. (See D.I. 15 at 10) Defendants reason that the Code simply provides incentives to participate in an apprenticeship program, and has done so since 2007; the fact that plaintiff's members choose not to participate in such programs cannot equate to irreparable harm.

Plaintiff's position is not an unreasonable one, in light of the fact that not all trades have available State-approved training programs. Nevertheless, plaintiff's

---

[4] Indeed, the record indicates that plaintiff's members have chosen not to participate in any apprenticeship program, not that their ERISA plans are being affected in any way by the Code.

10

argument is based more on argument than on facts specific to its members.[5] On this record, the irreparable harm factor also favors defendants.

### D. Balance of Harms

This factor favors neither plaintiff nor defendants. NCC has an interest in completing its publicly-funded projects timely, safely, and efficiently. Plaintiff has an interest in protecting and promoting its members' economic welfare.

### E. Public Harm

This factor also is evenly balanced. Injunctive relief will bring delay and consequential damages to a publicly-funded construction project. Concomitantly, "there is a public interest in fostering open and fair competition." *Tootsie Roll Indus, Inc. v. Sathers, Inc.*666 F. Supp. 655, 661 (D. Del. 1987).

### III. CONCLUSION

For the reasons stated, I conclude that plaintiff has failed to carry its burden to demonstrate, on the record presented, that injunctive relief is appropriate. One aspect of this conclusion is directed to preemption and the analytical framework embraced herein, which framework mirrors that proposed by the defendants. It is not clear to me, however, whether there are issues of fact that need to be vetted and addressed before closing the case by dismissal, consistent with defendants' pending motions. Therefore, an order shall issue giving plaintiff the opportunity to identify such. Failure to timely respond shall result in dismissal.

---

[5]Again, it is unclear from the record, e.g., whether ABC's members have apprenticeship programs - ERISA or non-ERISA - or whether they have been frustrated in their attempts to comply with the Code because of the State's failure to maintain/approve such programs.

11